## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SIDNEY MARTIN, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>RETRIEVER MEDICAL/DENTAL PAYMENTS LLC and CRANIAL TECHNOLOGIES, INC.<br><br>*Defendants.* | Case No. 7:26-cv-298<br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Sidney Martin, individually and on behalf of all others similarly situated, brings this class action complaint against Retriever Medical/Dental Payments LLC d/b/a Rectangle Health ("Rectangle Health") and Cranial Technologies, Inc. ("CTI") to put an end to their unlawful disclosure of Plaintiff's and the proposed Class's protected health information. Upon personal knowledge as to Plaintiff's own actions and experiences, and on information and belief as to all other matters, including based on an investigation conducted by counsel, Plaintiff complains and alleges as follows.

## INTRODUCTION

1.     This is a class action against Rectangle Health and CTI for violating Plaintiff's privacy rights by disclosing Plaintiff's personally identifiable information ("PII") and non-public personal health information ("PHI," and together with PII "Private Information") to third parties.

2.     Rectangle Health provides practice management software to tens of thousands of healthcare providers.

1

3. When a healthcare provider uses Rectangle Health's practice management platform, patients of that provider can use the platform to communicate with the provider online, including to manage appointments and pay bills.

4. Unbeknownst to patients, the platform incorporated online tracking technology that automatically transfers patients' online communications with the platform to a third-party provider of the tracking technology.

5. The information disclosed to the third-party tracking technology vendor includes: (a) a unique identifier, which is sometimes referred to as a "client id," that the third-party vendor can use to identify the patient; (b) information sufficient to show that the patient has scheduled or confirmed an appointment with the specific provider; and (c) information sufficient to show that the patient is paying an invoice created by the specific provider.

6. This information is PHI protected by Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and its disclosure to a third party absent the patient's informed and express written consent is unlawful. The Office for Civil Rights at the United States Department of Health and Human Services ("HHS") has made clear, in a bulletin entitled *Use of Online Google Tracking Technology by HIPAA Covered Entities and Business Associates*, that the unlawful transmission of such protected information violates HIPAA's Privacy Rule:

> ***Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures*.[1]

7. The FTC also addressed these privacy concerns:

> In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. ***But when***

---

[1] *See Use of Online Google Tracking Technology by HIPAA Covered Entities and Business Associates,* available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Jan. 12, 2026) (emphasis in part in original and emphasis in part added).

*companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out.*[2]

8.      CTI is a healthcare provider that specializes in treating infants with plagiocephaly.

9.      CTI uses Rectangle Health's practice management platform. Through the platform, CTI patients can manage upcoming CTI appointments and pay CTI bills for prior healthcare services.

10.     Plaintiff's child received treatment from CTI.

11.     On January 15, 2025, Plaintiff communicated with CTI, through Rectangle Health's online practice management platform, to manage an upcoming appointment and pay a CTI invoice.

12.     Unbeknownst to Plaintiff, the tracking technology embedded in the platform captured those communications and transmitted them to the third-party marketing company commonly referred to as Google, alongside a unique personal identifier that allowed Google to identify Plaintiff.

13.     Plaintiff did not consent to these disclosures.

14.     Plaintiff now brings this action, on behalf of herself and all others similarly situated, seeking damages and injunctive relief.

## PARTIES

15.     Plaintiff Sidney Martin is a resident of Moreno Valley, California.

16.     Rectangle Health is a Delaware limited liability company headquartered in Valhalla, New York.

17.     CTI is an Arizona corporation headquartered in Tempe, Arizona.

---

[2] Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases*, the FTC Business Blog (July 25, 2023) (emphasis added)).

**JURISDICTION & VENUE**

18.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the laws of the United States, and, alternatively, under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least  one member of the class is a citizen of a state different from Defendants.

19.     This Court has personal jurisdiction over Rectangle Health because it is headquartered in and subject to general personal jurisdiction in New York, and, in the alternative, because it provides the practice management platform at issue from New York and could thus reasonably foresee litigating claims related to the practice management platform in New York.

20.     This Court has personal jurisdiction over CTI because it operates numerous healthcare clinics throughout the state of New York and thus has continuous and systematic contacts with New York, and, in the alternative, because it affirmatively reached out to New York to engage Rectangle Health to operate its practice management platform from New York, and thus could reasonably foresee litigating claims related to the practice management platform in New York.

21.     Venue is proper under 18 U.S.C § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

**COMMON FACTUAL ALLEGATIONS**

A.     ***Background on Web Servers, Web Browsers & Google Tracking Technology.***

22.      Web browsers are software applications that allow consumers to exchange electronic communications over the internet.

23.     Every website is hosted by a computer server through which the owner/operator of the website exchanges communications with internet users via their web browsers.

24.     When a user navigates to a website on a web browser, the user's browser sends a communication called a "GET request" to the web server, which contains instructions on the content being requested for viewing by the web browser.

25.     Upon receipt of the GET request, the web server sends a responsive communication called a "POST request" to the web browser, which contains the content requested and instructions to the web browser regarding how to display that content on the user's computer.

26.     The original GET and POST request includes the webpage's Universal Resource Locator ("URL") and metadata, including the user's IP address.

27.     The website owner/operator may also choose to embed tracking technology (often referred to as "cookies" or "pixels" or "beacons") on the website. Where tracking technology is embedded on a website, it is sent from the web server to the user's computer when the user navigates to the website. Once installed on the user's computer, it intercepts the user's communications with the website and sends them to the third-party vendor that created and provided the tracking technology, alongside one or more unique identifiers that the vendor can use to identify the website user.

28.     Tracking technology is often created and provided by third-party marketing companies, like Google. The third-party marketing companies use the intercepted communications to track users' online activities to create detailed profiles of their needs and likes and dislikes so that the users can be targeted with "relevant" marketing across the internet.

29.     The transmission of tracking technology from a website to a users' computer is surreptitious, and thus website users do not know when a website has caused tracking technology to be installed on their computers. Thus, without any knowledge, authorization, or action by a user, a website can install tracking technology on a user's computer and cause the device to

contemporaneously and invisibly direct the users' personally identifiable non-public medical information and communications to third parties.

30.    When a user accesses a website hosting a tracking technology, the tracking technology software scripts are installed on the user's computer and surreptitiously direct the user's web browser to send the user's communications with the website to the third-party technology provider.

31.    This secret transmission to the third-party technology provider contains the original requests exchanged with the host website (*i.e.* the "GET request" and "POST request"), along with additional data that the tracking technology is configured to collect. The tracking technology bundles this information with one or more unique identifiers identifying the website user, so that the third-party vendor can associate the communications with the individual using the website.

32.    The transmission to the third-party vendor is initiated by a tracking technology's code and occurs in real time while the user is communicating with the host website.

33.    Once the third-party technology vendor collects the information captured by the tracking technology, the third-party can store and use the information for various business purposes of their own, including creating profiles of the individual using the website for use in targeted advertising.

**B.    *Defendants Use Of Google Tracking Technology And Improper Disclosure Of Patients' Private Information.***

34.    CTI is a healthcare provider that specializes in treating infants with plagiocephaly.

35.    CTI uses Rectangle Health's practice management platform.

36.    Through the platform, CTI patients can manage upcoming CTI appointments and pay CTI bills for healthcare services.

37.    To do so, patients navigate to one of two websites: https://cranial-patient.xeniohealth.com and https://pay.balancecollect.com/m/cranialtech (collectively, the "Websites").

38.    Unbeknownst to CTI patients, CTI and Rectangle Health embedded the Websites with Google technology that intercepts patients' communications with the Websites and transfers that information to Google.

39.    Google is one of the largest marketing companies in the world.

40.    When a CTI patient navigated to either Website, the Google tracking technology was surreptitiously installed on their computers by the server hosting the Website.

41.    Once installed on a user's computer, the Google tracking technology secretly intercepted the user's communications with the Websites in real time—while they were being transmitted between the user's web browser and the server hosting the Website—and transmitted that information to Google, so that it could associate them with the individual website user, add to its detailed profile of that individual, and target that individual with marketing across the internet.

42.    The information captured by the Google tracking technology and transferred to Google includes the GET and POST requests exchanged between a patient's web browser and the server hosting the Websites, plain-language URLs that identify the website user as a CTI patient and describe what actions the user is taking on the Websites (*e.g.*, confirming an appointment or paying a bill), user IP address, and a unique identifier that allows Google to identify the website user and associate the intercepted communications with that person's profile in Google's database.

43.    This information disclosed to Google, among other things:

    a.    The website user's status as a CTI patient;

    b.    Whether the website user confirmed an appointment with CTI;

    c.    Whether the website user paid a CTI bill; and

d.  The identity of the website user.

44.  Thus, while using Defendants' services on the Websites, Plaintiff's and Class Members' Private Information was intercepted in real time and then disseminated to Google via the tracking technology that Defendants surreptitiously installed on the Websites.

45.  CTI patients did not consent to these disclosures. CTI patients did not provide written authorization for these disclosures.

46.  Defendants did not disclose to or warn Plaintiff or Class Members that Defendants transferred the Private Information contained in Plaintiff's and Class Members' communications with the Websites to a third-party marketing company, or that such information would be used by the marketing company to develop detailed profiles of their needs, like and dislikes so that Website users could be targeted with advertising across the internet.

47.  On the contrary, CTI's statement of privacy practices, which CTI makes available to patients, states that "[CTI] does not collect personal information from users browsing its Web site, except through specific feedback forms" and "[u]sers of Cranial Technologies' Web site browse anonymously."

**C.**  ***Defendants Disclosures To Google Violated HIPAA.***

48.  In the United States, personal health care information is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

49.  The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies

to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[3]

50.    The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

51.    IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

52.    Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2)(i) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

    A. Names;
    ***
    H. Medical record numbers;
    ***
    J. Account numbers;
    ***
    M. Device identifiers and serial numbers;

---

[3]    HHS.gov, Health Information Privacy (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

N. Web Universal Resource Locators (URLs);
O. Internet Protocol (IP) address numbers; … and
R. Any other unique identifying number, characteristic, or code…; and

(ii) the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

53.    In a Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), HHS confirmed that HIPAA's protections apply to regulated entities' use of tracking technologies on authenticated webpages, such as Defendants' use of the Google tracking technologies on the Websites and related subpages.[4] Specifically, HHS explained that "[t]racking technologies on a regulated entity's user-authenticated webpages generally have access to PHI. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage."[5]

54.    The HIPAA Privacy Rule requires any "covered entity" or regulated entity—which includes healthcare providers like CTI and their business associates like Rectangle Health—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ 160.103, 164.502.

55.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendants when they are disclosing individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

---

[4] *Use of Online Google Tracking Technology by HIPAA Covered Entities and Business Associates*, U.S. Dept' of Health & Human Services (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html ("HHS Privacy Bulletin").
[5] *Id.*

56.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm."

### i.  Patient status and payment data are protected by HIPAA

57.    An individual's status as a patient is protected by HIPAA.

58.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… *If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this Information would be PHI*.[6]

59.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.[7]

60.    The instructions continue:

> For example, it is "marketing" when: . . .  A health plan sells a list of its members to a company that sells blood glucose monitors, which intends to send the plan's members brochures on the benefits of purchasing and using the monitors.

---

[6]                     https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Jan. 12, 2026) (emphasis added).
[7] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited Jan. 12, 2026).

61. HHS has instructed for decades that patient status is protected by the HIPAA Privacy Rule:

    a) "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

    b) "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere status with the covered entity, 67 Fed. Reg. 53186 (Aug. 14, 2002), such as a patient list;

    c) It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

### ii. IP addresses are personally identifiable under HIPAA

62. An IP address is a number that identifies the address of a device connected to the internet.

63. IP addresses are used to identify and route communications on the internet.

64. IP addresses of individual Internet users are used by internet service providers, Websites, and third-party tracking companies to facilitate and track internet communications.

65. Google also tracks IP addresses associated with internet users.

66. Google tracks IP addresses for use of tracking and targeting individual homes and their occupants with advertising by using IP addresses.

67. Under HIPAA, an IP address is considered personally identifiable information:

    a. HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514 (2).

b. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also* 45 C.F.R. § 164.514(b)(2)(i)(O).

68.     Even though an IP address could be connected to several members of the same household, it is still considered PHI. That is true, *even when the individual does not have an existing relationship with the regulated healthcare entity*, since when the covered entity collects this information through its website or mobile app, it is indicative that the individual has received or will receive health care services or benefits from the medical provider.[8]

### iii.   There is no HIPAA exception for online tracking technologies

69.     HHS issued a bulletin in December 2022 (the "Bulletin") "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[9]

70.     In the Bulletin, HHS reminded covered entities that HIPAA applies to covered and regulated entities', such as Defendants', use of tracking technologies like the Google Tracking Pixels at issue here. Among other things, HHS explained that covered entities, such as healthcare providers, and their business associates violate HIPAA when they use tracking technologies that disclose an individual's identifying information (like an IP address) even if no treatment

---

[8] *See* HHS.gov, USE OF ONLINE GOOGLE TRACKING TECHNOLOGY BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Jan. 12, 2026).
[9] HHS.gov, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Google Tracking Technology to Protect the Privacy and Security of Health Information* (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html.

information is included and even if the individual does not have a relationship with the health care

provider:

> *How do the HIPAA Rules apply to regulated entities' use of tracking technologies?*
>
> Some regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps. The information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code. In some cases, the information disclosed may meet the definition of individually identifiable health information (IIHI), which is a necessary pre-condition for information to meet the definition of PHI when it is transmitted or maintained by a regulated entity.
>
> ***IIHI collected on a regulated entity's website or mobile app generally is PHI***, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. But the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to an individual's past, present, or future health, health care, or payment for health care.[10]

71.    Tracking technology vendors like Google here are considered business associates

under HIPAA if they provide services to Defendants and receive or maintain PHI, as they do:

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (e.g. health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then

---

[10] HHS.gov, *Use of Online Google Tracking Technology by HIPAA Covered Entities and Business Associates*,                 https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.  (emphasis added)/

the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[11]

72.     HHS explained that tracking technologies on covered entities' patient portals "generally have access to PHI" and may access diagnosis and treatment information or billing information, in addition to other sensitive data:

> Tracking on user-authenticated webpages
>
> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or hospital beneficiary portal or a telehealth platform. ***Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI***. Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. ***Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal***. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[12]

73.     No PHI may be disclosed to tracking technology vendors like Google here unless Defendants have properly notified its website users and entered into a business associate agreement with the vendor (i.e., Google):

> Regulated entities may identify the use of tracking technologies in their website or mobile app's privacy policy, notice, or terms and conditions of use. However, the Privacy Rule does not permit disclosures of PHI to a tracking technology vendor based solely on a regulated entity informing individuals in its privacy policy, notice, or terms and conditions of use that it plans to make such disclosures. Regulated entities must ensure that all tracking technology vendors have signed a BAA and that there is an applicable permission prior to a disclosure of PHI.
>
> If there is not an applicable Privacy Rule permission or if the vendor is not a

---

[11] *Id.*

[12] HHS.gov, *Use of Online Google Tracking Technology by HIPAA Covered Entities and Business Associates*,                    https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-onlinetracking/index.html. (emphases added.)

business associate of the regulated entity, then the individual's HIPAA-compliant authorizations are required before the PHI is disclosed to the vendor. Websites banners that ask users to accept or reject a website's use of tracking technologies, such as cookies, do not constitute a valid HIPAA authorization.

[I]t is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure.[13]

74.    Here, neither condition—proper notice or a business associates agreement with Google—have been fulfilled.

**D.    *Defendants transferred Plaintiff's Personal Information to Google.***

75.    Plaintiff's child received treatment from CTI.

76.    On January 15, 2025, Plaintiff communicated with CTI, through Rectangle Health's online practice management platform, to manage an upcoming appointment and pay one of CTI's bills.

77.    At approximately 10:39 a.m. pacific time, Plaintiff attempted to log-in to the Website located at https://cranial-patient.xeniohealth.com. Through the Google tracking technology embedded on the Website, Defendants contemporaneously disclosed to Google in real time: (a) Plaintiff's communications with the Website, including the related GET and POST requests, the URL of the Website, and the fact that Plaintiff requested to reset her password for the patient portal; (b) Plaintiff's IP address; and (c) a unique identifier that Google used to associate the communications with Plaintiff. This information identified Plaintiff as a user of CTI's healthcare services.

78.    At approximately 10:41 a.m. pacific time, Plaintiff confirmed an appointment with CTI on the Website located at https://cranial-patient.xeniohealth.com/appointmentValidation.

---

[13] *Id.*

Through the Google tracking technology embedded on the Website, Defendants contemporaneously disclosed to Google in real time: (a) Plaintiff's communications with the Website, including the related GET and POST requests, the URL of the Website, and the fact that Plaintiff had validated an appointment; (b) Plaintiff's IP address; and (c) a unique identifier that Google used to associate the communications with Plaintiff. This information identified Plaintiff as a user of CTI's healthcare services and revealed that she was attending an upcoming medical appointment with CTI.

79.     After confirming her upcoming appointment, Plaintiff requested information on payment options from the Website located at https://cranial-patient.xeniohealth.com/paymentOptions. Through the Google tracking technology embedded on the Website, Defendants contemporaneously disclosed to Google in real time: (a) Plaintiff's communications with the Website, including the related GET and POST requests, the URL of the Website, and the fact that Plaintiff had requested information regarding options for paying for CTI's services; (b) Plaintiff's IP address; and (c) a unique identifier that Google used to associate the communications with Plaintiff. This information identified Plaintiff as a user of CTI's healthcare services and revealed that she intended to pay for CTI's healthcare services.

80.     At approximately 10:42 a.m. pacific time, Plaintiff requested consent forms for completion prior to the appointment from the Website located at https://cranial-patient.xeniohealth.com/consentFormsAsPDF. Through the Google tracking technology embedded on the Website, Defendants contemporaneously disclosed to Google in real time: (a) Plaintiff's communications with the Website, including the related GET and POST requests, the URL of the Website, and the fact that Plaintiff had requested the consent forms; (b) Plaintiff's IP address; and (c) a unique identifier that Google used to associate the communications with

Plaintiff. This information identified Plaintiff as a user of CTI's healthcare services and revealed that she was completing paperwork in advance of the upcoming appointment.

81.    At approximately 10:46 a.m. pacific time, Plaintiff requested to pay for CTI's services and was redirected to the Website located at https://pay.balancecollect.com/m/cranialtech. Through the Google tracking technology embedded on the Website, Defendants contemporaneously disclosed to Google in real time: (a) Plaintiff's communications with the Website, including the related GET and POST requests, the URL of the Website, and the fact that Plaintiff was paying a balance owed to CTI; (b) the title of the Website, which was disclosed to Google as "Cranial Technologies Inc | Balance Collect | Payment"; (c) Plaintiff's IP address; and (d) a unique identifier that Google used to associate the communications with Plaintiff. This information identified Plaintiff as a user of CTI's healthcare services and revealed that she was paying an invoice for CTI's medical services.

82.    Plaintiff did not consent to these disclosures.

83.    Plaintiff did not provide express written authorization to Defendants to transmit this information to a third-party marketing company, like Google.

84.    Defendants did not notify or warn Plaintiff that this information would be transmitted to a third-party marketing company, and did not compensate Plaintiff for the data that was taken without authorization.

85.    By transferring this information to a third-party marketing company without Plaintiff's consent, Defendants violated Plaintiff's right to privacy and unlawfully disclosed Plaintiff's Private Information.

86.    Plaintiff suffered injuries and damages as a result of Defendants' conduct, including: (i) invasion of privacy; (ii) violation of confidentiality of her Private Information; (iii) loss of benefit of the bargain (which included access to CTI's healthcare services at the price paid,

without the additional consideration of allowing Defendants to provide her PHI to a third-party marketing company); (iv) loss of value of the Private Information; (v) statutory damages; and (vi) the continued and ongoing risk to her Private Information, which has now been stored in a database operated by a third-party marketing company and used for that company's internal purposes, including building a profile of Plaintiff's needs, like and dislikes and targeting her with marketing across the internet.

### E.    *Plaintiffs' and Class Members' Private Information has economic value.*

87.    The value of personal data is well understood and generally accepted as a form of currency. The robust market for internet user data has been analogized to the "oil" of the tech industry.[14] A 2015 article from TechCrunch accurately noted that "Data has become a strategic asset that allows companies to acquire or maintain a competitive edge."[15] That article noted that the value of a single Internet user—or really, a single user's data—varied from about $15 to more than $40.

88.    The Organization for Economic Cooperation and Development ("OECD") has published numerous volumes discussing how to value data such as that which is the subject matter of this Complaint, including as early as 2013, with its publication "Exploring the Economic of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[16] The OECD recognizes that data is a key competitive input not only in the digital economy but in all markets: "Big data now represents a core economic asset that can create significant competitive advantage for firms and drive innovation and growth."[17]

---

[14]    https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data

[15] https://techcrunch.com/2015/10/13/whats-the-value-of-your-data/

[16] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD DIGITAL ECONOMY PAPERS, No. 220 (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[17]    https://www.oecd-ilibrary.org/industry-and-services/supporting-investment-in-knowledge-capital-growth-and-innovation_9789264193307-en

89.     In *The Age of Surveillance Capitalism*, Harvard Business School Professor Shoshanna Zuboff notes that large corporations have transformed their business models from fee for services provided to customers to monetizing their user's data—including user data that is not necessary for product or service use, which she refers to as "behavioral surplus."[18] In essence, Professor Zuboff explains that revenue from Internet user data pervades every economic transaction in the modern economy. It is a fundamental assumption of these revenues that there is a market for this data.

90.     Professor Paul M. Schwartz noted in the *Harvard Law Review*:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[19]

91.     Likewise, in *The Wall Street Journal*, former fellow at the Open Society Institute (and current principal technologist at the ACLU) Christopher Soghoian noted:

> The dirty secret of the Web is that the "free" content and services that consumers enjoy come with a hidden price: their own private data. Many of the major online advertising companies are not interested in the data that we knowingly and willingly share. Instead, these parasitic firms covertly track our web-browsing activities, search behavior and geolocation information. Once collected, this mountain of data is analyzed to build digital dossiers on millions of consumers, in some cases identifying us by name, gender, age as well as the medical conditions and political issues we have researched online. Although we now regularly trade our most private information for access to social-networking sites and free content, the terms of this exchange were never clearly communicated to consumers.[20]

92.     As Professors Acquisti, Taylor, and Wagman relayed in their 2016 article "The Economics of Privacy," published in the *Journal of Economic Literature*: "Such vast amounts of collected data have obvious and substantial economic value. Individuals' traits and attributes (such

---

[18] Shoshanna Zuboff, THE AGE OF SURVEILLANCE CAPITALISM 166 (2019).
[19] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056–57 (2004).
[20] Julia Angwin, *How Much Should People Worry About the Loss of Online Privacy?*, THE WALL STREET JOURNAL (Nov. 15, 2011).

as a person's age, address, gender, income, preferences, and reservation prices, but also her clickthroughs, comments posted online, photos uploaded to social media, and so forth) are increasingly regarded as business assets that can be used to target services or offers, provide relevant advertising, or be traded with other parties."[21]

93.    The cash value of the personal user information unlawfully collected by Defendants provided during the Class Period can be quantified. For example, in a study authored by Tim Morey, researchers studied the value that 180 internet users placed on keeping personal data secure.[22] Web browsing histories were valued at $52.00 per year.



94.    Similarly, the value of user-correlated internet browsing history can be quantified, because Google Inc. was willing to pay users for similar information. Google had a panel called "Google Screenwise Trends" which, according to the internet giant, is designed "to learn more

---

[21] Alessandro Acquisti, Curtis Taylor, and Liad Wagman, *The Economics of Privacy*, 54 J. of Econ. Literature 2, at 444 (June 2016), https://www.heinz.cmu.edu/~acquisti/papers/AcquistiTaylorWagman-JEL-2016.pdf

[22] Tim Morey, *What's Your Personal Data Worth?*, DESIGN MIND (Jan. 18, 2011), https://web.archive.org/web/20131206000037/http://designmind.frogdesign.com/blog/what039syour-personal-data-worth.html.

about how everyday people use the Internet." Upon becoming a panelist, internet users would add a browser extension that shares with Google the sites they visit and how they use them. The panelists consented to Google tracking such information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com. After three months, Google also agreed to pay panelists additional gift cards "for staying with" the panel. These gift cards, mostly valued at exactly $5, demonstrated that internet industry participants understood the enormous value in internet users' browsing habits. Google pays Screenwise panelists up to $3 per week to be tracked.

95.    User-correlated URLs have monetary value. They also have non-monetary, privacy value. For example, in a study by the Pew Research Center, 93% of Americans said it was "important" for them to be "in control of who can get information" about them. Seventy-four percent said it was "very important." Eighty-seven percent of Americans said it was "important" for them not to have someone watch or listen to them without their permission. Sixty-seven percent said it was "very important." And 90% of Americans said it was "important" that they be able to "control[] what information is collected about [them]." Sixty-five percent said it was very important.

96.    Likewise, in a 2011 Harris Poll study, 76% of Americans agreed that "online companies . . . control too much of our personal information and know too much about our browsing habits."

97.    A number of platforms have appeared where consumers can and do directly monetize their own data, and prevent tech companies from targeting them absent their express consent:

a.  Brave's web browser, for example, will pay users to watch online targeted ads, while blocking out everything else.[23]

b.  Loginhood states that it "lets individuals earn rewards for their data and provides website owners with privacy tools for site visitors to control their data sharing," via a "consent manager" that blocks ads and tracking on browsers as a plugin.[24]

c.  Ex-presidential candidate Andrew Yang's "Data Dividend Project" aims to help consumers, "[t]ake control of your personal data. If companies are profiting from it, you should get paid for it."[25]

d.  Killi is a new data exchange platform that allows you to own and earn from your data.[26]

e.  Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[27]

f.  The Nielsen Company, famous for tracking the behavior of television viewers' habits, has extended their reach to computers and mobile devices through Nielsen Computer and Mobile Panel. By installing the application on your computer, phone,

---

[23] Get Paid to Watch Ads in the Brave Web Browser, at: https://lifehacker.com/get-paid-to-watch-ads-in-the-brave-web-browser-1834332279#:~:text=Brave%2C%20a%20chromium-based%20web%20browser%20that%20boasts%20an (Lifehacker, April 26, 2019) ("The model is entirely opt-in, meaning that ads will be disable by default. The ads you view will be converted into Brave's cryptocurrency, Basic Attention Tokens (BAT), paid out to your Brave wallet monthly").

[24] https://loginhood.io/. *See also* https://loginhood.io/product/chrome-extension ("[s]tart earning rewards for sharing data – and block others that have been spying on you. Win-win.").

[25] How Does It Work, at: https://www.datadividendproject.com/ ("Get Your Data Dividend…We'll send you $$$ as we negotiate with companies to compensate you for using your personal data.").

[26] https://killi.io/earn/.

[27] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

tablet, e-reader, or other mobile device, Nielsen tracks your activity, enters you into sweepstakes with monetary benefits, and earn points worth up to $50 per month.[28]

98.    Technology companies recognize the monetary value of users' sensitive, personal information, insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[29]

## CLASS ACTION ALLEGATIONS

99.    Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

100.    Plaintiff seeks to represent the following four classes:

    a.    **Nationwide Rectangle Health Class**: all individuals in the United States whose Private Information was disclosed to a third-party without consent through tracking technologies embedded in Rectangle Health's practice management platforms.

    b.    **California Rectangle Health Subclass**: all individuals in California whose Private Information was disclosed to a third-party without consent through tracking technologies embedded in Rectangle Health's practice management platforms.

---

[28] Kevin Mercandante, *Ten Apps for Selling Your Data for Cash, Best Wallet Hacks* (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[29] Kari Paul, *Google launches app that will pay users for their dat*a, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacystudy; Saheli Roy Choudhury and Ryan Browne, *Facebook pays teens to install an app that could collect all kinds of data*, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-datatechcrunch.html; Jay Peters, *Facebook will now pay you for your voice recordings*, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voicespeech-recognition-viewpoints-proununciations-app.

    c. **Nationwide CTI Class**: all individuals in the United States whose Private Information was disclosed to a third-party without consent through tracking technologies embedded in the Websites.

    d. **California CTI Subclass**: all individuals in California whose Private Information was disclosed to a third-party without consent through tracking technologies embedded in the Websites.

101.    Excluded from each class are Defendants, their agents, affiliates, parents, subsidiaries, officers and directors, any entity in which Defendants have a controlling interest, and any Judge who adjudicates this case, including their staff and immediate family.

102.    Plaintiff reserves the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

103.    Numerosity, Fed R. Civ. P. 23(a)(1). The Class members are so numerous that joinder of all members is impracticable. Upon information and belief, there are tens of thousands of individuals in each of the proposed classes whose Private Information may have been improperly accessed by the Tracking Technology Vendors, and the Class is identifiable within Defendants' records.

104.    Commonality & Predominance, Fed. R. Civ. P. 23(a)(2) and (b)(3). Questions of law and fact common to the proposed classes exist and predominate over any questions affecting only individual Class Members. These include:

    a. Whether and to what extent Defendants had a duty to protect the PII and PHI of Plaintiff and Class Members;

    b. Whether Defendants had duties not to disclose the PII and PHI of Plaintiff and Class Members to unauthorized third parties;

25

    c.   Whether Defendants breached those duties by embedding tracking technology on the Websites;

    d.   Whether Defendants' conduct violated the statutes identified herein;

    e.   Whether Plaintiff and Class Members are entitled to actual, consequential, statutory, and/or nominal damages as a result of Defendants' conduct;

    f.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their PII and PHI.

105.    Typicality, Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised in the same or similar ways as a result of Defendants' use of tracking technologies.

106.    Adequacy, Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, including data privacy litigation related to the use of tracking technologies on websites, and Plaintiff intends to prosecute this action vigorously.

107.    Superiority and Manageability, Fed. R. Civ. P. 23(b)(3). Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary

duplication of evidence, effort and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against a defendant, like Defendants, with significant resources. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

108.    Policies Generally Applicable to the Class. This class action is also appropriate for certification because Defendants has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

109.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

110.    The litigation of the claims brought herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

111.    Ascertainability & Notice. Membership in the Class can be determined by objective records maintained by Defendants and adequate notice can be given to Class Members directly using information maintained in Defendants' records.

112.    Class-wide Injunctive Relief, Fed. R. Civ. P. 23(b)(2). Unless a Class-wide injunction is issued, Defendants will continue in its failure to properly secure the Private Information of Class Members, Defendants may continue to refuse to provide proper notification to Class Members regarding the practices complained of herein, and Defendants may continue to act unlawfully as set forth in this Complaint as Defendants has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate under Rule 23(b)(2) of the Federal Rules of Civil Procedure.

113.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      a.    Whether Defendants owed a legal duty to not disclose Plaintiff's and Class Members' Private Information;

      b.    Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c.   Whether Defendants failed to comply with applicable policies, laws, regulations, and industry standards relating to the security of protected health information;

    d.   Whether Defendants adequately and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

    e.   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

    f.   Whether Class Members are entitled to actual, consequential, statutory and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

## CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")

### 18 U.S.C. § 2511(1) *et seq.*

### UNAUTHORIZED INTERCEPTION, USE AND DISCLOSURE

### (On Behalf of Plaintiff & the Nationwide Rectangle Class & the Nationwide CTI Class)

114.    Plaintiff repeats and re-alleges each and every allegation in the Complaint as if fully set forth herein.

115.    The ECPA protects both sending and receipt of communications.

116.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

117.    The transmissions of Plaintiff's PII and PHI to Defendants' Websites qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

118.    Electronic Communications. The transmission of PII and PHI between Plaintiff and Class Members and Defendants' Websites with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

119.    Content. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

120.    Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

121.    Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.  Plaintiff's and Class Members' web browsers;

    b.  Plaintiff's and Class Members' computing devices (including mobile devices);

    c.  Defendants' web-servers;

    d.  Defendants' Websites; and

    e.  The tracking technology deployed by Defendants that captured Plaintiff's and Class Members' communications and transmitted them to third parties.

122.    By intentionally utilizing and embedding tracking technology on the Websites, and other similar practice management platforms provided by Rectangle Health, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

123.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

124.    By intentionally using or endeavoring to use the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

125.    Unauthorized Purpose. Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, HIPAA, intrusion upon seclusion, breach of confidence, invasion of privacy, and CIPA.

126.    Defendants intentionally used the wire or electronic communications to increase profit margins. Defendants specifically used the Google tracking technology to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

127.    Defendants were not acting under color of law to enable the interception of Plaintiff and Class Member's wire or electronic communication.

128.    Plaintiff and Class Members did not authorize Defendants to acquire the content of their communications.

129.    Any purported consent that Defendants received from Plaintiff and Class Members was not valid.

130.    In sending and in acquiring the content of Plaintiff's and Class Members' communications relating to the browsing of Defendants' Website, Defendants' purpose was tortious, criminal, and designed to violate federal and state legal provisions, as described above, and including the following: (i) a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person; (ii) violation of HIPAA; and (iii) other intentional torts as described herein.

## COUNT II

## NEGLIGENCE

**(On behalf of Plaintiff & the Nationwide Rectangle Health Class & the Nationwide CTI Class)**

131.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

132.    Defendants owed, and continue to owe, a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information.

133.    Defendants breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

134.    It was reasonably foreseeable that Defendants' failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information through their use of the Google tracking technology would result in unauthorized third parties, such as Google, gaining access to such Private Information for no lawful purpose.

135.    Defendants' duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class Members' Private Information arose due to the special relationship that

existed between Defendants and their patients, which is recognized by statute, regulations, and the common law.

136.    In addition, Defendants also had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to PHI.

137.    Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their Private Information. Defendants' misconduct included the failure to (i) secure Plaintiff's and Class Members' Private Information; (ii) comply with industry standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of the Google tracking technology.

138.    As a direct and proximate result of Defendants' breach of their duties, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

139.    Defendants' wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class Members' Private Information constituted (and continue to constitute) negligence at common law.

140.    Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

**COUNT III**

## BREACH OF FIDUCIARY DUTY

### (On Behalf of Plaintiff & the Nationwide Rectangle Health Class & the Nationwide CTI Class)

141.    Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

142.    A relationship existed between Plaintiff and Class Members on the one hand and Defendants on the other in which Plaintiff and Class Members put their trust in Defendants to protect the Private Information of Plaintiff and Class Members, and Defendants accepted that trust.

143.    Defendants breached the fiduciary duty that they owed to Plaintiff and Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, the Private Information of Plaintiff and Class Members.

144.    Defendants' breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

145.    But for Defendants' breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

146.    Defendants' breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

147.    As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

### COUNT IV

### BREACH OF CONFIDENCE

**(On behalf of Plaintiff & the Nationwide Rectangle Health Class & the Nationwide CTI Class)**

148.    Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

149.    Healthcare providers have a duty to their patients to keep non-public medical information confidential.

150.    Plaintiff and Class Members had reasonable expectations of privacy in their communications exchanged with Defendants, including communications exchanged on Defendants' Websites.

151.    Contrary to their duties as a healthcare provider and its express promises of confidentiality, Defendants installed the Google tracking technology to disclose and to transmit to third parties Plaintiff's and Class Members' communications with Defendants including Private Information and the contents of such information.

152.    These disclosures were made without Plaintiff's or other Class Members' knowledge, consent or authorization.

153.    The third-party recipients included Google.

154.    The harm arising from a breach of healthcare provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

155.    As a direct and proximate cause of Defendants' unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendants' breach in that:

      a.    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b.    Plaintiff and Class Members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements;

c.    Defendants eroded the essential confidential nature of the healthcare provider-patient relationship;

d.    Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensation for such data;

e.    Plaintiff and Class Members did not get the full value of the health care services for which they paid, which included Defendants' duty to maintain confidentiality; and

f.    Defendants' actions violated the property rights Plaintiff and Class Members have in their Private Information.

## COUNT V

## INVASION OF PRIVACY

**(On Behalf Of Plaintiff and the California Rectangle Health Subclass & the California CTI Subclass)**

156.    Plaintiff, individually and on behalf of the California Rectangle Health Subclass & the California CTI Subclass, incorporates the foregoing allegations as if fully set forth herein.

157.    The right to privacy in California's constitution creates a right of action against private entities such as Defendant.

158.    Plaintiff's and Class patients' expectation of privacy is deeply enshrined in California's Constitution. Article I, section 1 of the California Constitution provides:

All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and

protecting property and pursuing and obtaining safety, happiness, and privacy.

159.    The phrase "and privacy" was added by the "Privacy Initiative" adopted by California voters in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Critically, the argument in favor of Proposition 11 reveals that the legislative intent was to curb businesses' control over the unauthorized collection and use of consumers' personal information, stating:

> The right of privacy is the right to be left alone… It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[30]

160.    The principal purpose of this constitutional right was to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Defendant.

161.    To plead a California constitutional privacy claim, a plaintiff must show an invasion of (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy in the circumstances; and (3) conduct by the defendant constituting a serious invasion of privacy.

162.    As described herein, Defendants has intruded upon the following legally protected privacy interests:

      i.        The California Invasion of Privacy Act as alleged herein;

---

[30] BALLOT PAMP., PROPOSED STATS. & AMENDS. TO CAL. CONST. WITH ARGUMENTS TO VOTERS, GEN. ELECTION *26 (Nov. 7, 1972).

ii.     A Fourth Amendment right to privacy contained on personal computing devices, including web-browsing history, as explained by the United States Supreme Court in the unanimous decision of *Riley v. California*;

iii.    The California Constitution, which guarantees Californians the right to privacy; Defendants' promise not to collect, use or share Plaintiff's and Class patients' personal data via online tracking technologies without authorization; and

iv.     HIPAA.

163.    Plaintiff and Class patients had a reasonable expectation of privacy under the circumstances in that Plaintiff and Class patients could not reasonably expect Defendants would commit acts in violation of state civil and criminal laws; and Defendants affirmatively promised users (including Plaintiff and Class patients) it would not collect, use or share Plaintiff's and Class patients' personal data via online tracking technologies without authorization.

164.    Defendants' actions constituted a serious invasion of privacy in that it:

v.      Invaded a zone of privacy protected by the Fourth Amendment, namely the right to privacy in data contained on personal computing devices, including browsing histories

vi.     Violated state laws on wiretapping and invasion of privacy, including the California Invasion of Privacy Act;

vii.    Invaded the privacy rights of thousands of Americans (including Plaintiff and Class patients) without their consent;

viii.   Constituted the unauthorized taking of valuable information from thousands of Americans through deceit; and

      ix.      Further violated Plaintiff's and Class patients' reasonable expectation of privacy via Defendants' review, analysis, and subsequent uses of Plaintiff's and Class patients' private browsing activity that Plaintiff and Class patients considered sensitive and confidential.

165.    Committing the above privacy violations against thousands of Americans constitutes an egregious breach of social norms that is highly offensive.

166.    The surreptitious and unauthorized tracking of the confidential browsing history and medical information of thousands of Americans constitutes an egregious breach of social norms that is highly offensive.

167.    Defendants' intentional intrusion into Plaintiff's and Class patients' computing devices and web-browsers was highly offensive to a reasonable person in that Defendants violated state criminal and civil laws designed to protect individual privacy and against theft.

168.    The taking of personally-identifiable information from thousands of Americans through deceit is highly offensive behavior.

169.    Secret monitoring of private web browsing is highly offensive behavior.

170.    Wiretapping, eavesdropping on, and surreptitious recording of communications, and/or enabling the same, is highly offensive behavior.

171.    Following Defendants' unauthorized collection of the sensitive and valuable personal information, the subsequent analysis and use of that private browsing activity and medical information to target Plaintiff, Class patients, and consumers with advertising violated their reasonable expectations of privacy.

172.    Defendants lacked a legitimate business interest in analyzing users' data and tracking users while browsing their website to target them with advertising without their consent.

173.     Plaintiff and Class patients have been damaged by Defendants' invasion of their privacy and are entitled to just compensation and injunctive relief.

## COUNT VI

## INTRUSION UPON SECLUSION

### (On behalf of Plaintiff & the Nationwide Rectangle Health Class & the Nationwide CTI Class)

174.     Plaintiff, individually and on behalf of the Nationwide Rectangle Health Class & the Nationwide CTI Class, incorporates the foregoing allegations as if fully set forth herein.

175.     Plaintiff asserting claims for intrusion upon seclusion must plead (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

176.     In carrying out its scheme to track Plaintiff's and Class patients' communications while they were communicating with the Rectangle Health practice management platform in violation of HIPAA, Defendants intentionally intruded upon the Plaintiff's and Class patients' solitude or seclusion in that it enabled third-parties to place themselves in the middle of a private place, conversation, or matter to which they were not authorized.

177.     Defendants' tracking was not authorized by the Plaintiff and Class patients.

178.     Defendants' intentional intrusion into their computing devices and web-browsers was highly offensive to a reasonable person in that they violated state criminal and civil laws designed to protect individual privacy and against theft.

179.     The taking of personally-identifiable information from thousands of Americans through deceit is highly offensive behavior.

180.     Secret monitoring of private web browsing and communications with a medical provider is highly offensive behavior.

181.    Wiretapping and surreptitious recording of communications and/or enabling of the same is highly offensive behavior.

182.    Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." The desire to control one's information is only heightened while a person is browsing the internet after manually disabling online tracking technologies through a website's consent banner and privacy center.

183.    Plaintiff and the Class patients have been damaged by Defendants' invasion of their privacy and are entitled to reasonable compensation including but not limited to the value of the data that was taken without compensation.

**COUNT VII**

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT,**

**Cal. Penal Code § 631(a)**

**(On Behalf of Plaintiff & the California Rectangle Health Subclass & the California CTI Subclass)**

184.    Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

185.    CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

. . .

Willfully and without the consent of all parties to the communication, or in any
unauthorized manner, reads or attempts to read or learn the contents or meaning of
any message, report, or communication while the same is in transit or passing over
any wire, line or cable or is being sent from or received at any place within this
state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in
any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully
do, or permit, or cause to be done any of the acts or things mentioned above in this
section.

186.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies"
such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21
(N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to
effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022
WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section
631(a) applies to Internet communications.").

187.    The Google tracking technology is a "machine, instrument, contrivance, or … other
manner" used to engage in the prohibited conduct at issue here.

188.    Google is a "separate legal entity that offers [a] 'software-as-a-service' and not
merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further,
Google has the capability to use the wiretapped information for its own purposes. Accordingly,
Google is a third-party to any communication between Plaintiff and Class Members, on the one

hand, and Defendants, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

189.    At all relevant times, via the Google tracking technology, Google willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

190.    At all relevant times, Google used or attempted to use the communications intercepted by their Google tracking technology to promote and improve their platforms and to build profiles of Defendants' patients so that they could be targeted with marketing across the internet.

191.    At all relevant times, Defendants aided, agreed with, employed, permitted, or otherwise enabled Google to wiretap Plaintiff and Class Members using the Google tracking technology and to accomplish the wrongful conduct at issue here.

192.    Plaintiff and Class Members did not provide their prior consent to Google's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications. Nor did Plaintiff and Class Members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise enabling Google's conduct.

193.    The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website, where the Google tracking technology was installed on users' computers, where the communications originated, and where Google—as enabled by Defendants—routed Plaintiff's and Class Members' electronic communications to its servers.

194.     Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 631(a) and injunctive relief to stop the violations alleged herein.

## COUNT VIII

## Violation Of the California Invasion of Privacy Act (CIPA), Cal. Penal Code § 632(a)

## (On Behalf of Plaintiff and the California Rectangle Health Subclass & the California CTI Subclass)

195.     Plaintiff, individually and on behalf of the California Subclass, incorporates the foregoing allegations as if fully set forth herein.

196.     California Penal Code § 632(a) provides, in pertinent part:

A person who, intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio, shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500) per violation, or imprisonment in a county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment.

197.     Therefore, under CIPA, a defendant must show it had the consent of all parties to a communication.

198.     Plaintiff's and Class Members' communications with the Websites are tracked by Defendants using the tracking technologies that users rejected. The user's affirmative actions, such

as inputting information, selecting options, and otherwise communicating with Defendants through the Websites constitute communications within the scope of CIPA.

199.    At all relevant times, Defendants used a recording device—the Google tracking technology—to record Plaintiff's and Class Members' internet communications while accessing the Websites. These communications were recorded and shared with, and intercepted by Google, in an individualized and personally identifiable manner without the authorization and consent of Plaintiff and Class Members.

200.    Defendants intentionally implemented the tracking technologies into the Websites that, without the knowledge and consent of Plaintiff and Class Members, recorded and transmitted the substance of their confidential communications with Defendants to the third-party trackers in an individualized and personally identifiable manner.

201.    Google willingly coordinated and acted with Defendants to install the tracking technologies on the Websites.

202.    Plaintiff and Class Members are residents of California and used their devices to visit the Websites within California. As such, Defendants record, disseminate, and intercept Plaintiff's and Class Members' data, communications, and personal information in California.

203.    Plaintiff and Class Members did not consent to Defendants' actions in implementing the tracking software as described above nor did they consent to Defendants' intentional collection, sharing, and interception of Plaintiff's and Class Members' Private Information as described above.

204.    At all relevant times to this Complaint, Plaintiff and the other Class Members did not know Defendants was engaging in the recording, sharing, and intercepting of information as set forth above, and therefore could not provide consent to have any part of their private and

confidential communications and personally identifiable information disclosed by Defendants and intercepted by the third-party trackers in a personally identifiable and individualized manner.

205.    The following items constitute "recording device" under CIPA:

a.    The computer codes and programs Google used to track Plaintiff's and Class Members' communications while they were navigating the Websites; and

b.    The computer codes and programs used by Google to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit the Websites.

206.    Defendants failed to disclose their use of the tracking technology to track and automatically and simultaneously transmit communications and personally identifiable information in a de-anonymized and disaggregated fashion to Google for pecuniary purposes.

207.    The personal information the tracking technologies intercept includes  searching, viewing, and purchasing Defendants' healthcare services, and reveals that the Website user is a CTI patient and paying for CTI's healthcare services.

208.    As a direct and proximate result of Defendants' violation of the CIPA, Plaintiff and Class Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

209.    By disclosing and intercepting Plaintiff's and Class Members' private information, Defendants violated Plaintiff's and Class Members' statutorily protected right to privacy.

210.    As a result of the above violations and pursuant to CIPA Section 637.2, Defendants are liable to each Plaintiff and Class Member for the greater of treble actual damages related to their loss of privacy in an amount to be determined at trial or for statutory damages in the amount of $5,000 per violation. Section 637.2 specifically states that "[it] is not a necessary prerequisite

to an action pursuant to this section that the Plaintiff has suffered, or be threatened with, actual damages."

211.    Under the statute, Defendants are also liable for reasonable attorney's fees, litigation costs, and injunctive and declaratory relief.

**COUNT IX**

**VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW ("UCL")**

**CAL. BUS. & PROF. CODE § 17200 *ET SEQ.***

**(On Behalf of Plaintiff & the California Rectangle Health Subclass & the California CTI**

**Subclass)**

212.    Plaintiff and Class Members repeat and re-allege each and every allegation in the Complaint as if fully set forth herein.

213.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 (UCL). By engaging in the practices aforementioned, Defendants has violated the UCL.

214.    Defendants' "unlawful" acts and practices include its violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 631, 632; California common-law; and the federal statutes identified herein.

215.    Defendants' conduct violated the spirit and letter of these laws, which protect privacy interests and prohibit unauthorized disclosure and collection of private, personal data and communications.

216.    Defendants' "unfair" acts and practices include its violation of privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Plaintiff and Class members need not establish that these statutes were actually violated, although the claims pleaded herein do so.

217. Defendants' conduct constitutes unfair business practices under the UCL because these practices offend established public policy and hurt Plaintiff and class members, which cannot be reasonably avoided, and that outweighs any benefit to consumers or competition. The conduct also is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

218. Defendants' appropriation of class members' private, personal data and communications was to their economic and commercial advantage.

219. At no time has Defendants affirmatively sought consent from class members before appropriating their private, personal data and communications.

220. Plaintiff and class members received no compensation from Defendants' use of their private, personal data and communications.

221. California's UCL allows anyone to bring an action for injunctive relief if they have "lost money or property as a result of the unfair competition." Cal. Bus. & Prof. § 17204.

222. Plaintiff lost money or property because of Defendants' unfair and unlawful practices in violation of the UCL because Defendants took data of value from Plaintiff without compensation.

223. Defendants' actions caused damage to and loss of Plaintiff's and Class members' right to control the dissemination and use of their personal information.

224. Plaintiff's and class members' private, personal data and communications are likely to remain available to Defendants, without Plaintiff's and class members' consent, and without compensation from Defendants for their appropriation and use. Indeed, the longer Defendants is allowed to continue its practices the more information that it can unfairly and unlawfully collect.

225. Plaintiffs seek an order to enjoin Defendants from such unlawful, unfair and fraudulent business acts or practices and to restore to Plaintiff their interest in money or property that might have been acquired by Defendants through unfair competition.

226.    Defendants reaped unjust profits and revenues in violation of the UCL. Plaintiff and the Class seek restitution and disgorgement of these unjust profits and revenues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sidney Martin respectfully pray for judgment in her favor and against Defendants as follows:

A. For an Order certifying this action as a Class action and appointing Plaintiff as Class Representatives and Plaintiff's counsel as Class Counsel;

B. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;

D. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

E. For an award of nominal damages, actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

F. For an award of punitive damages, as allowable by law;

G. For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

H. Pre- and post-judgment interest on any amounts awarded; and

I. Such other and further relief as this Honorable Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Sidney Martin hereby demands that this matter be tried to a jury.

Dated:  January 13, 2026                         DWOSKIN WASDIN LLP

                                                 *s/ Eric S. Dwoskin*
                                                 Eric S. Dwoskin
                                                 433 Plaza Real, Suite 275
                                                 Boca Raton, FL 33432
                                                 Tel.: (561) 849-8060
                                                 edwoskin@dwowas.com

                                                 *Attorney for Plaintiff and the putative Class*